# Supreme Court of Texas

No. 20-0079

James Construction Group, LLC and
Primoris Services Corporation,

*Petitioners*,

v.

Westlake Chemical Corporation,

*Respondent*

On Petition for Review from the
Court of Appeals for the Fourteenth District of Texas

CHIEF JUSTICE HECHT, joined by Justice Devine, Justice Busby, and Justice Bland, dissenting in part.

Gregory Price, 55, suffered a fatal injury while working on a construction project in December 2012 as a result of a serious safety violation by his employer, James Construction. Price's death was all James' fault. Price was standing on a ladder leaning against a truck when a co-employee flagged the truck forward without checking to see if Price was clear, even though that violated standard protocol and common sense. Price fell, suffered a closed head injury, and died. His

tragic injury was entirely preventable, and OSHA issued James multiple citations.

That was not the first time project owner Westlake Chemical had to deal with James' safety problems. In eight months as a general contractor on the project in 2012, James had been cited multiple times for safety violations. And despite Westlake's repeated insistence that James improve its record, safety violations continued even after Price's death. By April 2013, Westlake could take no more. Its managerial team met with James' team to tell them James was terminated for chronic, serious safety violations. This upset James' vice president. "[E]verybody kills somebody on the job", he said, "why are you penalizing us?"[1] That was the last straw for Westlake. A few days later, James acknowledged in writing that it had been terminated.

Section 21.3 of the parties' contract authorized Westlake to terminate James for serious safety violations. The provision required notice to James of the violations, Westlake's dissatisfaction with remediation efforts, and termination. Section 9.1 required that notices be in writing. The Court acknowledges that "[s]ubstantial compliance is the appropriate standard when evaluating whether a party complied with a contractual notice condition."[2] Notice can be untimely, deficient, sent in the wrong manner, or misdirected, and still be effective.[3] "[A]s a general principle of Texas law", the Court declares, "a party's minor

---

[1] The Court dismisses the statement as "distasteful". *Ante* at 36-37 n.20. Westlake's team was shocked. "It blew us away", said one.

[2] *Id.* at 20.

[3] *Id.* at 22-23.

deviations from a contractual notice condition that do not severely impair the purpose underlying that condition and cause no prejudice do not and should not deprive that party of the benefit of its bargain."[4]

The single exception, the Court holds, is the form of notice. If a contract calls for a party to give written notice of a matter, then there must be a writing of some kind, even if deficient, else the party forfeits all contractual benefits, even though the opposing party was fully aware of the matter and was not prejudiced in any way by the lack of a writing.[5] The Court professes to have found no Texas case to the contrary, while misreading a Fifth Circuit case and relying on dicta and inapposite cases. Importantly, the Court altogether ignores a fundamental rule of Texas law, that "[f]orfeitures are not favored in Texas, and contracts are construed to avoid them."[6]

Even if the Court were correct that parties must strictly comply with the form of notice called for in their contract, Westlake met the Court's requirement of a writing, and the contents and manner of its notices satisfy the substantial compliance standard the Court applies—as found by the jury. The Court admits that Westlake's emails regarding safety violations, especially following Price's death, may have been sufficient for the first of three required notices. The Court faults continuing email traffic between Westlake and James as being too

---

[4] *Id.* at 23.

[5] *Id.* at 29-30.

[6] *Aquaplex, Inc. v. Rancho La Valencia, Inc.*, 297 S.W.3d 768, 774 (Tex. 2009); *see Sirtex Oil Indus., Inc. v. Erigan*, 403 S.W.2d 784, 788 (Tex. 1966) (noting that "the law abhors a forfeiture").

encouraging and not expressive of Westlake's dissatisfaction, though the only reason for the emails was James' continuing safety violations and Westlake's resulting concerns. And the Court concludes there was no written notice at all of James' termination, despite its project manager's letter to Westlake, stating: "Per the direction of Westlake[,] [James] has discontinued mechanical work on the . . . project . . . ." James' written acknowledgment of termination should satisfy any requirement of a writing.

With sleight of hand, the Court tries to make the issue whether there were writings, then hold that there was at best only one of the three the contract required because the writings that were indisputably exchanged were deficient. The substance of Westlake's notices is governed, as the Court acknowledges, by the substantial-compliance doctrine, and the jury found that Westlake satisfied it. The issue the Court must address, yet avoids, is whether there is any evidence to support the jury's findings. There is.

This flaw in the Court's analysis illustrates the difficulty of carving out an exception to the substantial compliance rule generally applicable to construction contracts. In some situations there may be no writings at all, so that the issue is the form of the notice. But in many, as here, there are writings, and the issue is not form, but substance, to which the substantial-compliance doctrine applies.

The Court seeks to justify strict compliance with the form of written notice by arguing that it "eliminates after-the-fact disputes

4

about exactly what notice was given."[7] But that is precisely why the usual substantial compliance rule should apply. There are no such credible disputes in this case. James' safety violations were not "done in a corner."[8] James had a terrible safety record and knew it. Even after a fatal injury for which it was wholly at fault, and which was entirely and easily preventable, James' attitude was: "[E]verybody kills somebody on the job". This record does not contain even the slightest hint of dispute about James' safety record or the reason for its termination. The jury affirmatively found that Westlake's actual notice to James did not "impair the purpose" of written notice "and caused no harm to James."

On the other hand, the Court observes that the substantial-compliance doctrine "serves the important purpose of preventing parties from engaging in bad-faith, 'gotcha' tactics to avoid their own contractual obligations based on a technicality."[9] Again, that is precisely why the doctrine should apply in this case. Though James knew full well everything of which Westlake repeatedly gave notice, the Court allows James to escape its contractual obligation to pay the $1 million costs Westlake incurred because of James' termination. By the Court's reasoning, Westlake could have scribbled "terminated" on a napkin and handed it to James' angry project manager, and the result in this case would be completely different. The absence of one word labeling what everyone knew was happening results in a $1 million forfeiture of contractual benefits awarded by the jury.

---

[7] *Ante* at 27.

[8] *See* Acts 26:26.

[9] *Ante* at 24.

Finally, the Court holds that one provision of the parties' contract must be strictly enforced while another, which would also allow Westlake to recover the same damages, does not mean what it says. Section 17.2 gave Westlake, during James' work, "the right to intervene in any appropriate way," particularly for safety's sake. The Court concludes that this remedy is subject to the notice requirements of Section 21.3, ignoring the clear statement in Section 17.2: "This right is in addition to any other remedies [Westlake] may have [under the contract]." Because the provision authorizes Westlake to require James to bear the cost of the intervention, the Court concludes that the provision "implies" that James will still be on the job after the intervention, even though the fact—not the implication—is that Westlake claims James must bear the cost of the intervention after it left the project. So: "written" means written, no matter what, but "any appropriate way" means some appropriate way, not including termination. The Court does not take notice of the inconsistency, much less the irony, in its positions.

The jury found that James' breaches of Sections 21.3 and 17.2 cost Westlake $1,054,251.81, which the contract required James to reimburse. Though James was well aware of its repeated, serious safety violations and angry at Westlake for insisting on a safe jobsite, the Court orders that Westlake forfeit its contractual rights for lack of a writing that the jury found did not harm James. I disagree that Westlake failed to comply with the notice requirements of Section 21.3 and that it cannot recover its excess costs in completing the work under Sections 21.3 and 17.2. I therefore respectfully dissent.

6

**I**

The Court holds that the rule of substantial compliance applies to contractual notice conditions in two ways. First, the rule applies to the *substance* of the notice. In the example the Court cites, one parent's notice to the other of proposed international travel, required before the other was required to consent, substantially complied with the divorce decree even though it omitted significant information—like where they would stay and when they would return.[10]

Second, the rule applies to the *method* of notice. In the Court's examples, notice need not be sent by registered mail, as the parties contracted,[11] or to the location directed in the contract,[12] as long as it was received. In the Court's view, the content of the notice—which, after all, is the very point of requiring that notice be given—and the manner of the notice's delivery need only substantially comply with the parties' agreement. But if a contract calls for written notice, the Court decrees, then there must be a writing, even if the parties' contract does not insist on strict compliance, and even if notice is completely ineffectual where, as here, notice confers no information not already indisputably known to both parties.

As rationales for its new rule, the Court offers precedent and policy.

---

[10] *Id.* at 22-23 (citing *In re G.D.H.*, 366 S.W.3d 766, 771 (Tex. App.—Amarillo 2012, no pet.)).

[11] *Id.* at 23 (citing *Barbier v. Berry*, 345 S.W.2d 557, 562 (Tex. Civ. App.—Dallas 1961, no writ)).

[12] *Id.* (citing *Tex. Utils. Elec. Co. v. Aetna Cas. & Sur. Co.*, 786 S.W.2d 792, 793 (Tex. App.—Dallas 1990, writ denied)).

## A

As for precedent, the Court says it has found "no Texas cases holding that a party's provision of oral notice complies, substantially or otherwise, with a requirement of *written* notice."[13] Actually, there is one, which the Court has found but does not recognize: *South Texas Electric Cooperative v. Dresser–Rand Co.*,[14] decided by three Texas judges on the federal appeals court applying Texas law.

In *South Texas*, Dresser contracted to repair any defects in the electric turbine it sold the Co-op after the Co-op provided written notice of such defects. If Dresser failed to make the repairs, the Co-op, after a second, ten-day written notice to Dresser, had the right to repair the defects itself at Dresser's expense. From startup, vibrations in the turbine impaired its use. Dresser knew of the problems, and for two years the parties emailed back and forth about them. Finally, the Co-op, "without providing Dresser further written notice, employed outside consultants to do the repair work."[15]

"[T]he jury found that [the Co-op] substantially complied with the contract's notice provisions",[16] and the Circuit held that was sufficient to allow it to recover. The Circuit rejected Dresser's argument that the substantial-compliance doctrine did not apply to a contractual requirement for written notice. Further, the Circuit held that "Dresser's

---

[13] *Id.* at 24.

[14] 575 F.3d 504 (5th Cir. 2009) (opinion by Haynes, J., joined by Jones, C.J., and Higginbotham, J.).

[15] *Id.* at 506.

[16] *Id.*

8

arguments are contrary to well-established Texas law, recognizing the applicability of the doctrine of substantial compliance to contractual notice provisions."[17] Dresser knew that the Co-op was consulting with experts, even though the Co-op did not give Dresser written notice that the experts would repair the turbine at Dresser's expense. The Circuit concluded: "[T]he evidence here supports a conclusion that the underlying purpose of the ten-day notice requirement . . . was fully served by the actual notice received by Dresser."[18]

This Court dismisses *South Texas* as inapposite because the Circuit stated that the Co-op had hired outside consultants to repair the turbine "without providing Dresser *further* written notice",[19] noting that the parties had exchanged writings on the need for repairs. But the Circuit's opinion clearly states, and the Co-op did not dispute, that the Co-op did not give Dresser the contractually required written notice that repairs were to be made. Dresser argued on appeal that whatever it may have known about the Co-op's use of experts, it was entitled to the written notice for which it contracted. This Court says that the Circuit's "focus was *not* on the lack of a writing",[20] but that was the very focus of the entire case. The Circuit's opinion refers to "written" notice five times. The parties' contract required written notice. None was given. The Circuit applied the substantial-compliance doctrine and held, as the jury had found, that the Co-op satisfied it.

---

[17] *Id.* at 507.

[18] *Id.* at 508.

[19] *Ante* at 29 (quoting *S. Tex. Elec. Coop.*, 575 F.3d at 506).

[20] *Id.*

9

The Court also dismisses *South Texas* because "federal law" is not needed to "fill in [a] gap" in Texas jurisprudence.[21] With respect, the Court's statement makes no sense. *South Texas* did not apply federal law; it applied Texas law to a Texas case. There was no "gap" in Texas law; the applicability of substantial compliance to contractual written notice provisions was "well-established".[22] The Court can certainly disagree with *South Texas*; it cannot dismiss it.

The Court cites four cases in support of its holding. Two, *Cheung–Loon, LLC v. Cergon, Inc.*,[23] and *Tennessee Gas Pipeline Co. v. Technip USA Corp.*,[24] have nothing whatever to do with substantial compliance. Both denied recovery because no notice of any kind was given. In the former, the court stated that "appellees point to no evidence that any of the alleged notifications informed [the opposing party] of their position [or] the contractual right they now claim was breached."[25] In the latter, a case factually similar to the present one, the court rejected the argument that "no notice is required" of one party's intent to repair defective workmanship at the other's expense.[26] Neither the words "substantial compliance" nor the concept appear in either case.

In a third case, *Emerald Forest Utility District v. Simonsen*

---

[21] *Id.* at 28.

[22] *S. Tex. Elec. Coop.*, 575 F.3d at 507.

[23] 392 S.W.3d 738 (Tex. App.—Dallas 2012, no pet.).

[24] No. 01-06-00535-CV, 2008 WL 3876141 (Tex. App.—Houston [1st Dist.] Aug. 21, 2008, pet. denied).

[25] *Cheung–Loon*, 392 S.W.3d at 745.

[26] *Tennessee Gas Pipeline*, 2008 WL 3876141, at *20.

10

*Construction Co.*, the court stated that "[t]he controlling issue is whether [a party] warranted the sufficiency of the design of the sewer system."[27] In dicta, the court noted that "[w]hen a contract provides for a particular form of notice, compliance with such provisions is a condition precedent to invoking the contract rights which are conditioned on the notice."[28] But the court did not state that substantial compliance does not apply. Again, neither the words nor the concept appear in the opinion.

The fourth case the Court cites is *Shaller v. Commercial Standard Insurance Co.*, a decision of this Court.[29] The jury in the case found that the insureds had not consented to the cancellation of two insurance policies, but the court of appeals reversed judgment on the verdict, holding that consent was established as a matter of law. This Court reversed, holding that the insureds had no notice at all their policies would be cancelled, and therefore whether the insureds consented was a fact question for the jury.[30] The Court added that a policy provision requiring prior written notice of cancellation should be enforced absent waiver, agreement, or estoppel,[31] but it did not discuss substantial compliance. Neither the words nor the concept appear in the opinion.

The Court can hold that the substantial-compliance doctrine applies to construction contracts generally and notice provisions in

---

[27] 679 S.W.2d 51, 52 (Tex. App.—Houston [14th Dist.] 1984, writ ref'd n.r.e.).

[28] *Id.* at 54.

[29] 309 S.W.2d 59 (Tex. 1958).

[30] *Id.* at 66.

[31] *Id.*

11

particular and carve out a single exception for the form of notice. What it cannot do—or at least what it cannot do *legitimately*—is claim for its authority cases that do not discuss substantial compliance while dismissing a contrary case that does.

**B**

The Court argues that its exception to the substantial compliance rule is good policy because it avoids after-the-fact disputes over what notice was given and what the parties actually knew. But while such disputes are certainly worth avoiding, none exist in this case. Before and after an on-the-job death, Westlake and James were in constant conversation about how to improve safety on the project and whether James could continue on as a contractor.

In this situation, there is a stronger countervailing policy: the law's abhorrence of forfeitures and construction of contracts to avoid them. The Court agrees that Westlake would have strictly complied with the written notice requirement if it had scribbled only a few words, like "21.3" plus "safety", "dissatisfied", and "terminated". For want of a few words, Westlake forfeits the more than $1 million in damages found by the jury. And words would have added nothing to the parties' awareness of the safety problems and the unavoidable consequences.

The Court apologizes that it must read contracts the way the parties write them, but in this case, that is simply not true. Parties need only substantially comply with the substance of a contract's notice requirements. The Court demands that formal requirements must be read as written, but not substantive requirements. Here are the Court's words:

12

The courts' unfailing refusal to deem oral notice compliant with a contractual condition requiring written notice, like the doctrine of substantial compliance as a general matter, is consistent with our repeated affirmation that "[a]bsent compelling reasons, courts must respect and enforce the terms of a contract the parties have freely and voluntarily entered." The bargained-for requirement of written notice necessarily serves a purpose beyond actual notice; otherwise, its inclusion is useless.[32]

How is the application of substantial compliance in this case inconsistent with respecting and enforcing the parties' terms as written? A bargained-for requirement of written notice is not useless, any more so than a bargained-for requirement of registered mail or destination. The requirement sets the standard for the parties' desired certainty. Allowing notice sent by regular mail or to a different office does not disrespect the parties' right to contract. Rather, it assumes the parties contracted in good faith and not with the intent to spring technical "gotchas" on each other to avoid their obligations. Notice tantamount to written notice, which James clearly had, should be sufficient.

## II

In the end, the Court's rule that parties must strictly comply with a contractual requirement for the form of notice is of little significance to a decision in this case. The issue is not whether there were writings, but what they contained. On this issue, the Court is bound by the jury's findings that Westlake substantially complied with the contract unless there was no evidence to support them.

Westlake hired James in May 2012 as a general contractor to

---

[32] *Ante* at 26-27.

work on Westlake's chlor-alkali plant,[33] only their contract did not require Westlake to assign James work, or James to accept an assignment. Westlake was free to retain other contractors to do work James could do.

Section 21.3 of their contract provided:

If [Westlake] discovers or determines in its reasonable opinion that . . . [James] has serious safety violations[,] then [Westlake] may so notify James. Upon receipt of any such notice [James] shall begin to remedy the breach or defect cited within seventy-two (72) hours. If at any time [Westlake] is not reasonably satisfied with the pace and the quality of the remediation effort, [Westlake] will so notify [James] and [Westlake] may thereafter, at its sole discretion, elect to either terminate this Contract or portion of the Work by providing notice to that effect. After providing such notice [Westlake] shall have the unrestricted right to take possession of the Work or the portion thereof terminated and to purchase and/or hire materials, tools, supervision, labor, and equipment for the completion of the Work or of the unremedied condition, as [Westlake] elects. Any extra costs in excess of the Contract Price incurred by [Westlake] in this regard shall be at the expense of [James]. This right is in addition to any other remedies [Westlake] may have hereunder.

The provision thus called for Westlake to give three notices: of its opinion that James had serious safety violations, of its dissatisfaction with James' remediation effort, and of termination of James' work. The contract required that all notices be written.

On December 28, James' employee Gregory Price suffered a fatal head injury on the job. He fell from a ladder propped against the side of

---

[33] The chlor-alkali process produces chlorine and caustic soda by the electrolysis of brine.

14

a truck, helping to load it, when the driver was directed to pull ahead without checking to see that no one was near. OSHA cited James for a serious safety violation. It was the latest in a steady stream of violations.

The same day, Westlake's project manager, Abram Kuo, forwarded to his counterpart at James, Rusty DeBarge, an email Kuo had received from his superior stating that Price's death was "completely preventable", asking for James' incident rate of safety violations, proposing a safety review for James to show how it would prevent further incidents, and requiring James "to develop [a] preventive safety mind set [sic] with some extraordinary measures on job safety." Kuo followed up in a meeting with DeBarge a few days later, together reviewing James' safety record and emphasizing the importance of James' improving its safety performance.

The Court calls it "questionable" whether the December 28 email was the first notice under Section 21.3 because it did not mention that provision and did not specify when James' 72 hours to remediate began. But the contract required neither. The Court itself holds that the *substance* of the notice need only substantially comply with the contractual requirement. It certainly did, as the jury found. By any measure, an email stating that a preventable death on the job required a complete safety review expresses a reasonable opinion that there had been serious safety violations.

On January 18, DeBarge emailed Kuo to "appeal" "potential changes in the execution of the project going forward"—specifically James' removal from the project. Kuo emailed back the same day, confirming that Westlake might bring another contractor onto the

15

project. Quoting DeBarge's email back to him, Kuo agreed that everyone "would like to be judged by [their] intentions" but "are in fact judged by the results." Kuo added: "we all make mistakes and we all need to learn from [them]." On January 30, Westlake transferred work from James to a new contractor.

The Court concludes that this email was not the second notice called for by Section 21.3 because, like the December 28 email, it did not mention that provision, and because it acknowledged steps James had taken to improve safety and did not express dissatisfaction with James' performance. But the email exchange was precipitated by rumors DeBarge had heard that Westlake was going to switch to another contractor. Westlake was not terminating James because it was satisfied with James' work. The email exchange was premised on Westlake's dissatisfaction, and Westlake terminated part of James' work a few days later.

As with the December 28 email, the Court concludes that the January 18 email did not qualify as written notice under Section 21.3, not because it was not written, but because it was lacking in substance. But again, that must be determined under the substantial-compliance doctrine, and the jury found for Westlake. There was clearly some evidence in the January 18 email of Westlake's dissatisfaction with James' safety performance, which unquestionably existed. The Court never addresses the jury's verdict.

Finally, on April 11, after additional incidents even under a new site manager, James and Westlake representatives met in person. Westlake told James that its work was being reassigned to a different

16

contractor and that James had "five days to get [its] remaining piping and mechanical people off the job." Additionally, James was told that Westlake had "done everything [it could] do", and despite Westlake's efforts to help James, James "[fell] back into the same pattern" of safety problems. James' vice-president responded angrily: "[E]verybody kills somebody on the job[.] [W]hy are you penalizing us?" James immediately withdrew from the project.

On May 8, DeBarge emailed Westlake that "[p]er the direction of Westlake site management, [James] has discontinued mechanical work on the Chlor-Alkali project and we have completed the demobilization of the mechanical forces." The Court rejects this writing as complying with Section 21.3 because it was not sent by Westlake, but in reciting the notice Westlake gave at the earlier meeting, paired with James' withdrawal from the project, it served the same purpose as if coming from Westlake. Indeed, it showed James' own understanding of the situation.

The writings between Westlake and James satisfy the requirements of Section 21.3. Certainly, they substantially complied with those requirements, as the jury found.

### III

The Court holds that Section 21.3 of the contract must be read as written, but not Section 17.2. That provision states:

> [Westlake] shall at any time during the execution of the Work by [James] have the right to intervene in any appropriate way, if in the reasonable opinion of [Westlake], (a) [James'] performance is likely to lead to (i) defective Work, (ii) a material breach of this Contract, (b) the progress achieved by [James] is insufficient or likely to

17

result in the Work not being completed by the completion date stated in any Work Order or (c) [James] is performing its duties under this Contract in an unsafe way or manner in which [Westlake] believes may cause injury or damage to persons or property. In such cases [Westlake] shall have the right to require [James] to immediately take remedial action to the satisfaction of [Westlake]. [James] shall be solely accountable for all costs associated with such intervention and remedial action, whether incurred by [James], [Westlake] or any third party.

The Court concludes that intervention "in any appropriate way" does not mean requiring safety improvements and termination without notice, otherwise Section 21.3 would be meaningless. But Section 21.3 itself expressly states that the right it gives Westlake to intervene in James' work with notice "is in addition to any other remedies Westlake may have hereunder." Despite this plain statement, the Court reads Section 21.3 to confer an exclusive right to intervene, not an additional one.

Neither section need be read to trump the other. They provide alternative ways for Westlake to proceed. But, according to the Court, Section 17.2 prevails over Section 21.3 because "Texas courts regularly enforce unambiguous contract language agreed to by sophisticated parties in arms-length transactions."[34] The Court cannot have it both ways. If "written" must be read literally, then so must "any appropriate way".

\* \* \* \* \*

I would not except the form of notice required by construction contracts from the substantial-compliance doctrine, which applies to the rest of the contract. I would not insist that part of a contract must be

---

[34] *Ante* at 18.

read literally and that another part cannot be. I would hold that there is evidence to support the jury's findings that Westlake substantially complied with the contract's notice requirements. And I would not forfeit the $1 million damages awarded Westlake by the jury for want of a word or two. Therefore, I respectfully dissent.[35]

Nathan L. Hecht
Chief Justice

**OPINION DELIVERED:** May 20, 2022

---

[35] James raises an additional ground for reversal related to agency. The Court did not reach the issue because it held that Westlake may not recover under Section 21.3. *Ante* at 16-17 n.10. I would affirm the court of appeals' holding on the issue in Westlake's favor. Additionally, as to Part II(C) of the Court's opinion, I agree with the result that Westlake can recover on its indemnity claim, but I disagree with the Court's rationale that Westlake failed to comply with Section 21.3's notice requirements. *Cf. id.* at 42-43.